Daniel J. DEVANEY, as trustee under Chapter 11 of the Bankruptcy Code for CB & R (Holdings) Ltd., American Marine Industries, Inc., Chester, Blackburn & Roder, Inc., Chester, Blackburn & Roder (N.Y.), Inc., Pan Antilles Shipping Company, Current Trader Ltd., Atlantic Clipper Ltd., Atlantic Intrepid Ltd., Pan American Mall Line, Inc., Marine Terminals, Inc. and Linea Naviera Panatlantica, S.A., Debtors;

and

Panatlantic, Inc., Current Marine, Inc., Chester, Blackburn & Roder (South Atlantic), Inc., Chester, Blackburn & Roder, Ltd., Panamerica Inc. and Pancaribe, Inc., Debtors-in-Possession under Chapter 11 of the Bankruptcy Code, Plaintiffs,

v.

A.P. CHESTER, J.C. Sklaire, R.A. Chester, Jeremy Chester, John Lynch, Howard Morgan, Sheldon H. Kinney, Joseph Carroll, Paul A. Jasinski, John P. Love, Evangelos Alexander, John W. Battles, William Beylund, W.R. Blackburn, Alan Bouwmeester, R. Ross Camardella, Kevin Chester, Britt Chester, Kristine Chester, Kenneth Coleman, Frank Dapena, John Davidson, Peter Evelyn, P.K. Fung, Michele Grindlinger, Bruno Lehoucq, Ruth Lehoucq, Joseph Perez–Jones, Carmen Pizzaro, Ronald Rasmus, Wade Battles, Robert Shay, Joseph Sierra, Aline Sklaire, William Stewart, Perry Walter, Hill Betts & Nash, (In the capacity of Escrow Agent only), Grayson & Bock, Salomon Brothers, Inc., First Boston Commercial Corporation, First Boston Commercial Paper Corporation, Erik K. Klaussmann, III, and David Lindsay, Defendants.

83 Civ. 8455 (JFK).

United States District Court,
S.D. New York.

March 22, 1989.

Hahn & Hessen, New York City, for plaintiffs; Steven J. Mandelsberg, Barry Schkolnick, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for defendant Salomon Bros.; Peter D. McKenna, Richard H. Weiss, Karen B. Shaer, of counsel.

## OPINION AND ORDER

KEENAN, District Judge:

This matter is before the Court on the motion of defendant Salomon Brothers, Inc. ("Salomon") pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) to dismiss all claims asserted against it in the Fourth Amended Complaint (i.e., the First through Sixth Claims for Relief). With respect to the first through fifth claims, Salomon maintains that the complaint fails to allege fraud with particularity pursuant to Fed.R. Civ.P. 9(b). As to the fourth claim, Salomon contends that no private right of action exists under Section 352–c of the New York General Business Law.[1] Finally, Salomon argues that the sixth claim, for negligent misrepresentation, fails to state a claim for negligent misrepresentation. For the reasons stated below, the Court grants Salomon's motion in its entirety.

## BACKGROUND

The trustee's Fourth Amended Complaint represents his second attempt to plead fraud on the part of Salomon with the particularity Rule 9(b) mandates. The trustee's previous effort, the Second Amended and Supplemental Complaint (the "Second Amended Complaint"), was dismissed without leave to amend by this Court as to Salomon pursuant to Rule 9(b). See [1986–87 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 92, 747 (S.D.N.Y. Apr. 29, 1986) (the "April 29 Opinion"). The Second Circuit Court of Appeals affirmed the dismissal, but directed that the trustee be accorded a further opportunity to attempt to replead his claims with the requisite specificity. See Devaney v. Chester, 813 F.2d 566 (2d Cir.1987).

## FACTS

The core facts of this lawsuit were presented in considerable detail in the two aforementioned decisions and thus do not warrant repetition here. Following the decision of the Second Circuit Court of Appeals, the trustee engaged in extensive discovery in an effort to bolster his allegations of fraud against Salomon. Salomon provided the trustee with copies of the documents in its possession pertaining to the purchase of American Marine Industries, Inc. ("AMI") by CB & R. In addition, depositions were taken of David Lindsay, one of the two principals of CB & R; A.P. Chester, formerly the President, Chairman, and Chief Executive Officer of AMI; Paul A. Jasinski, the former Vice President and Chief Financial Officer of AMI; John P. Love, the former Secretary and General Counsel of AMI; and Donald Andrews, formerly of The First Boston Corporation ("First Boston"), which served as CB & R's financial adviser and provided funding for the acquisition transaction. See Compl. ¶ 30.

With the aid of such extensive discovery, the trustee filed the Fourth Amended Complaint.[2] To the conclusory allegations of his Second Amended Complaint, the trustee has added: (1) a brief excerpt from one internal AMI memorandum, another portion of which had already been quoted in the Second Amended Complaint; (2) two passages from a single letter from AMI's accountants to AMI's directors; and (3)

---

1. Daniel J. Devaney, as the trustee in bankruptcy (the "trustee") for CB & R (Holdings), Ltd. ("CB & R") has withdrawn the fourth claim, recognizing that no private right of action exists under Section 352–c of the New York General Business Law. See CPC Int'l v. McKesson Corp., 70 N.Y.2d 268, 514 N.E.2d 116, 519 N.Y.S.2d 804 (1987).

2. After this Court dismissed the Second Amended Complaint as to Salomon but before the Court of Appeals issued its opinion, the trustee filed a Third Amended Complaint, dated August 13, 1986.

allegations that two Salomon officers and a Salomon employee "had access" to whatever information AMI generated about the contemplated acquisition. *See, e.g.*, Compl. ¶ 41(B)(i). With these additions, the trustee contends that he has pled with sufficient particularity the circumstances constituting the alleged fraud perpetrated by Salomon. Before turning to the strength of this position, the Court will review the extent of Salomon's participation in AMI's acquisition.

In August, 1982, AMI retained Salomon as its exclusive agent to assist in the sale of AMI. (A copy of the engagement letter, dated August 26, 1982, is attached to the Fourth Amended Complaint as Exh. A thereto.) Because the engagement letter is crucial to the trustee's allegations of fraud, it must be cited at length:

"*Section 1. Services to be Rendered.* Salomon will perform such of the following financial advisory and investment banking services as the Company may reasonably request:

(a) Salomon will familiarize itself to the extent it deems appropriate and feasible with the business, operations, properties, financial condition and prospects of the Company and any prospective Buyer, it being understood that Salomon shall, in the course of such familiarization, rely entirely upon publicly available information and such other information as may be supplied by the Company or such Buyer, without independent investigation;

(b) Salomon will advise and assist [AMI] in developing a general negotiating strategy for accomplishing a [sale of AMI] ...

(c) Salomon will advise and assist [AMI] in identifying potential Buyers and will, on behalf of [AMI], contact such potential Buyers as [AMI] may designate ...

(d) Salomon will assist the Company in preparing a memorandum, for distribution to potential Buyers selected by Salomon and the Company, describing the Company and its business, operations, properties, financial condition and prospects, it being specifically agreed that (i) such memorandum shall be based entirely upon information supplied by the Company, which information the Company hereby warrants shall be complete and accurate in all material respects, and not misleading, (ii) the Company shall be solely responsible for the accuracy and completeness of such memorandum, and (iii) other than as contemplated by this paragraph, such memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, except with Salomon's prior written consent;

*Section 2. Fees.* [AMI] shall pay to Salomon for its services hereunder a cash fee equal to:

(a) $75,000, payable monthly following [AMI]'s execution of this letter; plus

(b) an additional fee of $75,000, such additional fee to be contingent upon [AMI] or any of its shareholders entering into an agreement with a Buyer to effect a [sale of AMI] and payable promptly following the execution of such an agreement; plus

(c) an additional fee equal to 3.0% of the Aggregate Consideration (less the $150,000 payable under the immediately preceding clauses (a) and (b)), such additional fee to be contingent upon the consummation of a [sale of AMI] and payable at the closing thereof or as soon thereafter as the amount of such fee is determinable ...

*Section 4. Indemnity and Contribution.* Recognizing that transactions of the type contemplated by this engagement sometimes result in litigation and that Salomon's role is limited to acting as [AMI]'s financial advisor, [AMI] agrees to indemnify Salomon (and its directors, officers, agents, employees and controlling persons) to the full extent lawful against any and all claims, losses and expenses as incurred (including all reasonable fees and disbursements) of Salomon's and such persons' counsel and all of Salomon's and such persons' reasonable travel and other out-of-pocket expenses incurred in connection with investigation of and any preparation for any

such pending or threatened claims and any litigation or other proceedings arising therefrom (such fees, disbursements and expenses to be reimbursed quarterly as incurred) arising out of any actual or proposed [sale of AMI] or Salomon's engagement hereunder...."

Compl., Exh. A.

Pursuant to the engagement letter, Salomon assisted in the preparation of a sixty page offering memorandum (the "Memorandum"), which detailed AMI for potential buyers. *See* Compl. ¶ 30. The trustee alleges that in preparing the Memorandum, Salomon officers Roger Miller and Charles Masson, and a Salomon employee identified only as "Mr. Lawrence":

"a) conducted an investigation of the business, assets and prospects of AMI;

b) visited AMI's Florida operations, as well as its New York offices;

c) met with AMI's principal officers and employees in New York and Florida;

d) met with the audit staff of defendant Grayson & Bock, AMI's auditors;

e) interviewed defendants A.P. Chester, Paul A. Jasinski, John P. Love, Ronald Rasmus and Jeremy Chester; and

f) were given full and free access to all the books, records, financial reports, financial statements and internal memoranda of AMI and its management."

Compl. ¶ 30.

Following these preparations, in September, 1982 Salomon sent CB & R the completed Memorandum. Consistent with the terms of the engagement letter, virtually all of the information set forth in the Memorandum was furnished by AMI. Indeed, much of the final product was actually drafted by AMI personnel. *See* Transcript of Deposition of Paul A. Jasinski, taken August 20, 1987, at 78–79, 86–89, 96–97, 104–108; Transcript of Deposition of John Love, taken June 11, 1987, at 69–70, 73–75, 90–91, 94–95, 138–39. The Complaint sets forth the following excerpts from the Memorandum:

"Over the past two years, after a lengthy period of generally consistent profits, AMI has come to face a situation of declining profits and cash shortages. [AMI] believes this situation is largely transitory, and has resulted from a depressed world economy, difficulty in controlling costs, and also disagreements among senior management."

\*   \*   \*   \*   \*   \*

"AMI believes that its American Atlantic subsidiary [AAS] has a unique franchise to capitalize on an impending pooling agreement covering all trade between the U.S. and North Coast of Brazil, including the Amazon region."

Compl. ¶ 33.

Salomon makes no separate objective factual representations in the Memorandum and does not suggest that the statements of AMI management's beliefs reflect Salomon's own views. Indeed, the cover page of the Memorandum explicitly disclaims that any of the information contained therein is based upon independent investigation by Salomon or constitutes any representation by Salomon itself.

The sale of AMI's shares was closed on November 24, 1982, when CB & R purchased 99.5% of AMI's outstanding common stock for an aggregate price of approximately $9.6 million. *See* Compl. ¶ 40. Contrary to the arguably sanguine assessment of AMI's financial fortunes in the Memorandum, the trustee maintains that the newly acquired AMI was travelling toward insolvency with the inevitability of a Greek tragedy. To support his contention that AMI and Salomon were aware of AMI's impending insolvency, the trustee has added to the Fourth Amended Complaint two brief passages from a July 16, 1982 letter from Grayson & Bock, AMI's accountants, to AMI's directors (the "Grayson & Bock letter") and another excerpt from the internal AMI memorandum dated June 2, 1982 from AMI's chief financial officer, Paul Jasinski, to the company's directors (the "Jasinski Memo") that was quoted in the Second Amended Complaint.

In the quoted portions of the Grayson & Bock letter, AMI's accountants state:

"We are all aware that AMI has a serious financial problem. This was highlighted last year when Grayson & Bock individually told key officers, directors and shareholders what we believed to be the problem areas of [AMI]. This was probably the first time that the suggestion of possible bankruptcy was made for the AMI group of companies.

\* \* \* \* \* \*

... [G]eneral business conditions have worsened severely since then and the negative results therefrom must be effectively dealt with. Recently a number of employees were laid off and certain costcutting measures were adopted. These measures are not nearly enough to sustain the continued existence of AMI."

Compl. ¶ 41(B)(i).

The additional brief excerpt from the Jasinski Memo states:

"We must not panic, but I see our cash reserves down to '0' by the fall if cargo and rates do not increase. We have already been put on C.O.D. by a large number of our vendors."

Compl. ¶ 41(B)(ii).

Unable to allege that anyone at Salomon actually saw the statements, the trustee asserts that Salomon personnel "had access" to this information and presumably is charged with knowledge of their contents. *See* Compl. ¶ 41(B)(i).

Containing these additional allegations, the Fourth Amended Complaint asserts six counts against Salomon. The first through third and fifth claims for relief, as in the Second Amended Complaint, maintain that Salomon's allegedly fraudulent conduct in disseminating the Memorandum violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2); § 17 of the 1933 Act, 15 U.S.C. § 77q; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder; and the New York common law of deceit. The sixth claim for relief, negligent misrepresentation under New York common law, is peculiar to the Fourth Amended Complaint.

Salomon contends that the first, second, third and fifth claims for relief are not pled with the particularity required by Rule 9(b) and must be dismissed without leave to amend. Salomon further urges that the sixth claim for relief against it must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), thus dismissing the Fourth Amended Complaint against Salomon in its entirety.

## DISCUSSION

### I. *The Fraud Claims*

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This heightened burden on the pleader reflects the desire to spare defendants the harm to their reputations attendant to an allegation of fraud absent concrete factual circumstances supporting the allegation. *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982). This Circuit has identified a number of salutary goals behind Rule 9(b): to assure a party accused of fraud fair notice of the alleged wrongdoing sufficient to enable him to prepare a defense, to forestall the facile assertion of conclusory allegations of fraud as a means of uncovering wrongdoing and to inhibit the assertion of unfounded fraud claims against perceived "deep-pockets for the nuisance settlement value." *See, e.g., DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987); *Decker*, 681 F.2d at 116.

Rule 9(b) pleadings generally cannot be based upon information and belief. *See Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972). Fraud allegations should specify the time, place, speaker, and content of the alleged misrepresentations. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986). Where pertinent information is so peculiarly within the defendant's knowledge, however, some elements of fraud may be justifiably pleaded on information and belief. Even in this situation, the complaint still must present facts upon which such belief is reasonably founded. *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974), *cert. denied*, 421 U.S.

976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). In any event, "the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987). *Accord Billard v. Rockwell Int'l Corp.*, 683 F.2d 51, 57 (2d Cir.1982) (Greater precision required "when full discovery has been had in a prior case.").

As discussed above, the trustee has had the benefit of wide-ranging discovery before filing his Fourth Amended Complaint. After the Second Circuit Court of Appeals' grant of leave to replead, Salomon produced copies of the documents in its possession pertaining to the AMI transaction. In the eight months preceding the filing of the Fourth Amended Complaint depositions were taken of three of the principal officers of AMI, as well as one of the principals of CB & R and the individual involved in this transaction on behalf of First Boston. Moreover, even before he served the Second Amended Complaint, the trustee had examined at length both of the principals of CB & R and had inspected the records of CB & R and AMI.

■ Consideration of the Fourth Amended Complaint's allegations of fraud against Salomon in light of the above compels the Court to conclude that the fraud allegations are deficient under Rule 9(b) in several respects. As the Court held with respect to the Second Amended Complaint, the initial sections of the Fourth Amended Complaint alleging selective facts about the disappointing transaction fail to plead against Salomon, with the requisite particularity, three essential elements of the fraud claims asserted. The Fourth Amended Complaint does not amply plead (1) that Salomon made material misrepresentations; (2) that Salomon at least had knowledge of the falsity of any such alleged misrepresentations; and (3) that CB & R actually relied on the alleged misrepresentations in acquiring AMI.

A. Material Misrepresentations

In dismissing the Second Amended Complaint as to Salomon, this Court found that:

there is no factual support for the conclusory allegation that AMI's management itself did not hold the substantive opinions about AMI's financial condition at the time Salomon reported those opinions in the Confidential Memorandum.
—April 29 Opinion at 93,649.[3]

The Fourth Amended Complaint fails to plead any new facts to remedy this deficiency.

The sole misrepresentation attributed to Salomon is the statement in the Memorandum that AMI believed that its evident financial difficulties were "largely transitory" and "resulted from a depressed world economy, difficulty in controlling costs, and also disagreements among senior management." Compl. ¶ 33. The only support in the instant Complaint for the allegation that this statement was "false and misleading" that was not contained in the Second Amended Complaint and previously determined inadequate are the three brief passages fully quoted in the statement of facts. The first two are excerpts from a letter dated July 16, 1982 from Grayson & Bock to AMI's directors. The third consists of two sentences from the same internal AMI memorandum from AMI's chief financial officer, Paul Jasinski, to AMI's directors that was quoted in the Second Amended Complaint. *See* Compl. ¶ 42(B); Second Amended Complaint ¶ 40(b)(ii).

In the quoted portions of the Grayson & Bock letter, AMI's accountants state "that AMI has a serious financial problem" and mention that in the previous year the possibility of AMI's bankruptcy was broached to AMI. The accountants continue that "[g]eneral business conditions have wors-

---

**3.** As the Court of Appeals found that this Court "was fully justified" in dismissing the Trustee's claims against Salomon based on "the inadequacy" of his allegations relating to scienter, *Devaney*, 813 F.2d at 569, it did not address the Court's further holding that the Trustee had failed to plead with sufficient particularity that AMI management did not, at the time the Memorandum was prepared, actually hold the opinions set forth therein.

ened severely since then and the negative results therefrom *must be effectively dealt with.*" Compl. ¶ 41(B)(i) (emphasis added). Finally, the accountants opine that the remedial measures implemented up to that time "are not nearly enough" to continue to sustain AMI. *Id.* The additional brief excerpt from the Jasinski Memo warns "[w]e must not panic, but I see our cash reserves down to '0' by the fall *if* cargo and rates do not increase." Compl. ¶ 41(B)(ii) (emphasis added). The Court finds no inconsistencies between the quoted statements and the views expressed in the Memorandum.

The quoted portions of the Grayson & Bock letter and the Jasinski Memo indicate only that AMI was experiencing serious financial difficulties. There is no suggestion that the difficulties are irremediable. The Memorandum with which the statements are allegedly at odds concedes in *no uncertain terms:*

> "Over the past two years, after a lengthy period of generally consistent profits, AMI has come to face a situation of declining profits and cash shortages."

Compl. ¶ 33.

The selected passages from these two documents, upon which the trustee relies to demonstrate that AMI management did not in fact believe that AMI's financial problems were "largely transitory" and "resulted from a depressed world economy, difficulty in controlling costs, and also disagreements among senior management," simply do not suggest a belief that AMI's financial difficulties were incurable.

On the contrary, the Grayson & Bock letter observes that the difficulties "must be effectively dealt with," implying that such problems are curable. Compl. ¶ 41(B)(i). Similarly, the excerpt from the Jasinski Memo tempers its admonition with a conditional "if." Compl. ¶ 41(B)(ii). Moreover neither document suggests in any way that AMI management did not actually hold the views set forth in the Memorandum as to the causes of AMI's deteriorating financial condition. The Court concludes that no factual support has been pleaded for the conclusory proposition that AMI's management itself did not subscribe to the substantive opinions about AMI's financial condition at the time Salomon reported those opinions in the Memorandum.

### B. Scienter

In affirming the dismissal of the Second Amended Complaint, the Second Circuit Court of Appeals stated that although Rule 9(b) provides that knowledge may "be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester,* 813 F.2d 566, 568 (2d Cir.1987). *Accord Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). "It is reasonable to require that the plaintiffs specifically plead those events" which "give rise to a strong inference" that the defendant had knowledge of the falsity. *Ross v. A.H. Robins, Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

In *Devaney,* the Second Circuit Court of Appeals held that the Second Amended Complaint did not sufficiently plead facts which would support an inference that Salomon was aware that AMI's management did not hold the opinions reported to Salomon:

> "The complaint does not allege any facts to suggest who at Salomon Brothers possessed such knowledge, when and how they obtained the knowledge, or even why anyone at Salomon Brothers should have known that the views expressed in the prospectus did not represent the true beliefs of AMI management.
>
> Thus, the district court was correct in finding that '(t)he conclusory statements that Salomon knew that AMI did not subscribe to the beliefs reported in the Confidential Memorandum do not allow for any inference, let alone a strong one, regarding Salomon's knowledge.'" *Devaney,* 813 F.2d at 568–69.

The trustee contends that he has remedied this defect by:

> "1. Identifying *who* at Salomon possessed such knowledge—Salomon's officers Miller, Masson and Lawrence; and

2. Alleging *when* and *how* they obtained this knowledge—during September 1982, when they conducted their due diligence investigation of the business, assets and prospects of AMI and enjoyed full and free access to all of AMI's books, records, financial reports, financial statements and internal memoranda."

Pltffs' Mem. at 12. The Court disagrees that the trustee has raised any inference regarding Salomon's knowledge.

The trustee is unable to allege that anyone at Salomon actually saw or was provided any of the documents selectively quoted in the Fourth Amended Complaint, much less who at Salomon saw the documents, and when or how Salomon obtained them. Moreover, no facts are alleged suggesting that anyone at Salomon was even aware of the existence of these documents when the Memorandum was prepared.

Faced with this serious deficiency in his case against Salomon, the trustee has responded with the vague allegation that Salomon officers "had access" to AMI documents which clashed with the arguably optimistic appraisal of AMI's future contained in the Memorandum. The trustee asserts that in this Circuit, statements that a party charged with fraud had access to specific documents supporting a claim of misrepresentation are sufficient to raise the requisite factual basis for an allegation of scienter. *See Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985). In *Goldman,* plaintiff filed a class action on behalf of himself and other shareholders of defendant Sykes, a company engaged in the design, manufacture, and marketing of microcomputer systems, alleging that the company and certain of its officials had disseminated a series of very positive forecasts as to the likely success of a new product which were materially misleading to investors. Noting that "great specificity was not required with respect to the allegations of knowledge and scienter," the *Goldman* Court ruled that plaintiff's allegation that defendants "had or had access" to the information withheld from the investor class provided a sufficient factual basis for the allegations of scienter. *Id.* at 1070.

*Goldman,* however, does not stand for the blanket proposition that allegations that defendants had "access" to withheld information always satisfies the scienter requirement in averments of fraud. Some factual basis for the allegations of scienter must be adduced. *See Id.* In *Goldman,* plaintiff "alleged that the defendants portrayed themselves in their public statements during the class period as persons highly knowledgeable about the industry and Sykes's role in it." *Id.* Thus, the *Goldman* Court ruled that the complaint had sufficiently alleged:

"that the factual basis for attributing that knowledge to them during the period had come from defendants' own public statements and self-portrayals as industry-wise businessmen; the additional implication of the Complaint is that the alleged failure to qualify the bullish statements was intended to permit individual defendants to profit from an inflated market price before the truth became known."

*Id.* at 1070. Indeed, the complaint there had alleged that several of the individual defendants had sold abnormally large blocks of Sykes shares during the period the bullish statements were disseminated, raising an inference "that the optimistic projections were unfounded." *Id.* at 1063.

In the instant matter, the Fourth Amended Complaint is barren of any factual basis for the conclusory allegations of scienter. The trustee makes no allegation that Salomon held itself out at any time as being, or in fact was "highly knowledgeable" about AMI, its business, or its financial condition. Indeed, Salomon made clear on the cover of the Memorandum that the information contained therein was secondhand, unverified, and not the product of any independent investigation by Salomon. *See* McKenna Aff., Exh. E. This representation was consistent with the terms of the engagement letter, in which AMI and Salomon agreed that in preparing the Memorandum, Salomon would rely "entirely upon information supplied by the Company" and perform no "independent investigation." Compl., Exh. A, §§ 1(a), (d).

Assuming *arguendo*, then, that this Court was satisfied that the trustee has sufficiently alleged that Salomon had made material misrepresentations in the Memorandum, it would be unable to wring a factual basis for the allegations of scienter as to Salomon from the Fourth Amended Complaint. The trustee fails to identify any Salomon personnel who actually saw information at odds with the information contained in the Memorandum. He does not indicate when and how this information was obtained. In short, the trustee has failed to remedy the defects in his pleading identified previously by this Court and the Second Circuit Court of Appeals.

### C. Reliance

The trustee contends "that the issue of reliance is not the proper subject of a Rule 9(b) motion." Pltffs' Mem. at 14. The trustee draws this broad proposition from the appellate decision in this case. The Second Circuit Court of Appeals held that this

> "court should not ... have considered the *reasonableness* of appellants' reliance; that issue went to the merits of appellants' claims and thus was not properly before the court on Salomon's 9(b) motion."

*Devaney*, 813 F.2d at 569 (emphasis added). This prohibition against inquiry into the reasonableness of reliance does not relieve the trustee of his obligation to "plead with particularity the circumstances of his reliance on any misstatements or omissions and the losses suffered by reason of the misrepresentations." *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1091 (S.D.N.Y.1977), *aff'd mem.*, 636 F.2d 1201 (2d Cir.1980). *Accord Todd v. Oppenheimer & Co., Inc.*, 78 F.R.D. 415, 420 (S.D.N.Y. 1978).

Here, reliance is alleged only in summary form in each of the Claims for Relief against Salomon without particularizing who, on behalf of CB & R, in fact read and relied on the statement in the Memorandum. *See* Compl. ¶¶ 44, 57, 62, 69. This failure to specify the circumstances of reliance runs afoul of Rule 9(b).

### II. *Claims Against Salomon Premised Upon Secondary Liability*

#### A. Aider and Abettor Liability

■ In the April 29 Opinion, this Court held that the Second Amended Complaint failed "to substantiate the allegation of Salomon's purported liability as a conspirator, aider or abettor." April 29 Opinion at 93,649. This Court identified the three elements required to state a claim under the securities laws as an aider and abettor as follows:

> "1. The existence of a securities law violation by the primary party;
>
> 2. 'Knowledge' of this violation by the secondary party (Salomon);
>
> 3. Substantial assistance by the secondary party in the accomplishment of the primary violation."

April 29 Opinion at 93,649.

In that opinion, this Court ruled that the first element had been adequately pleaded. For the reasons set forth in Part I B of this Opinion and Order, pp. 1262 to 1264, *supra*, the Court concludes that the trustee has inadequately pleaded the second element of aider and abettor liability. Because this deficiency is fatal to the trustee's aider and abettor claims, the Court need not address the trustee's pleading of the third element.

#### B. Conspiracy Allegations

■ The April 29 Opinion also found the allegations of conspiracy in the Second Amended Complaint "lacking in specificity." April 29 Opinion at 93,649. The Fourth Amended Complaint has not improved upon this deficiency. To adequately plead Salomon's liability as a co-conspirator, the trustee must set forth facts sufficient to support allegations that Salomon had knowledge of the conspiracy and that Salomon entered into an agreement with the Group I and Group II stockholders to defraud CB & R. *See* April 29 Opinion at 93,649. Bald allegations, as here, that a defendant acted "in concert" with another are clearly insufficient to state a claim for conspiracy liability under Rule 9(b). *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir.1982). Accordingly, the trustee's conspiracy claims are dismissed.

■ Failure to comply with Rule 9(b) ordinarily results not in outright dismissal, but in an order directing the errant pleader to replead his fraud allegations in conformity with the Rule. *See Luce v. Edelstein,* 802 F.2d 49, 56–57 (2d Cir.1986). Where a prior opportunity to remedy Rule 9(b) pleading defects has already been afforded, however, it is within the discretion of the district court to deny leave to replead. *See Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987); *Decker,* 681 F.2d at 115. The trustee has enjoyed the benefit of extensive discovery of his fraud claims subsequent to the Court of Appeals' grant of leave to replead those claims. Nevertheless, those claims still do not pass muster under Rule 9(b). Because this Court does not perceive additional discovery to be the solution to the deficiencies in the trustee's fraud claims, it declines to grant leave to replead the fraud claims against Salomon.

### III. *Negligent Misrepresentation*

Salomon moves to dismiss the trustee's sixth Claim for Relief, negligent misrepresentation under New York state law, for failure to state a claim. A motion to dismiss for failure to state a claim may be granted only if it appears that under no possible set of facts would the plaintiff be entitled to relief. *See Lipsky v. Commonwealth United Corp.,* 551 F.2d 887 (2d Cir.1976). Even if it appears on the face of the pleadings that recovery is very remote, the complaint will withstand the motion to dismiss as long as the plaintiff retains a possibility of success. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Moreover, in deciding a motion to dismiss, the court must view the complaint in the light most favorable to the plaintiff. *See id.* at 237, 94 S.Ct. at 1687.

■ Construing the facts under this analysis, the Court must conclude that the trustee is unable to prevail on his negligent misrepresentation claim as a matter of law.

Salomon urges that the trustee's negligent misrepresentation claim must be dismissed because privity of contract is absent between Salomon and CB & R.

The hoary rule of *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931)

is the starting point in any discussion of the requirement of privity in a negligent misrepresentation claim. There, Chief Judge Cardozo announced that accountants would be liable in negligence only to individuals with whom they are in privity. *Ultramares* remains authoritative in New York and most jurisdictions. In New York, however, its rule has been relaxed in certain circumstances. In *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985), for example, the New York Court of Appeals ruled that accountants may be liable to noncontractual parties who detrimentally rely on negligently prepared financial reports when three factors are present:

"(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance."

*Id.* at 551, 483 N.E.2d at 118, 493 N.Y.S.2d at 443.

The exception to the strict privity rule carved out in *Credit Alliance* pertained only to "the application of the doctrine to accountants' liability." *Id.* The Second Department recently expressly rejected extending the *Credit Alliance* exception beyond the accounting profession. *See Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 135 A.D.2d 518, 521, 521 N.Y.S.2d 747, 750 (2d Dept. 1987). Nevertheless, the trustee contends that this Court should extend the *Credit Alliance* exception to the strict privity rule beyond the accounting profession to an investment banking firm such as Salomon. Reviewing the post-*Credit Alliance* decisions applying New York law, this Court concludes that the rule of strict privity remains the law with respect to negligent professionals other than accountants. *See Widett v. U.S. Fidelity & Guaranty Co.,* 815 F.2d 885, 889 (2d Cir.1987) ("It is well settled in New York ... that professionals

are not liable in either tort or contract absent privity."); *Crossland Savings, FSB v. Rockwood Ins. Co.*, 692 F.Supp. 1510 (S.D.N.Y.1988) ("New York courts have not extended the reasoning of *Credit Alliance* beyond its application to accountants."); *Vereins–Und Westbank, AG v. Carter*, 691 F.Supp. 704, 712 (S.D.N.Y.1988) ("No language in any [New York] Court of Appeals opinion we have found suggests that the *Ultramares* doctrine was designed exclusively for the accounting profession rather than for application to all professionals . . . .").

The considerable number of New York State cases cited in these decisions amply demonstrate that New York adheres to the rule of strict privity in negligence actions against professionals other than accountants. Because Salomon is an investment banking firm and has no contractual relationship with CB & R, the trustee's claim for negligent misrepresentation against it must be dismissed.

### CONCLUSION

For the reasons set forth above, defendant Salomon's motion to dismiss the Fourth Amended Complaint's claims against it is granted in its entirety.

SO ORDERED.