**UNITED STATES ex rel. and Philip DeCARLO, Plaintiffs,**

v.

**KIEWIT/AFC ENTERPRISES, INC., a Joint Venture, Kiewit Eastern Co. and AFC Enterprises, Inc., Defendants.**

94 Civ. 5741 (SWK).

United States District Court,
S.D. New York.

Aug. 22, 1996.

Blodnick Abramowitz & Blodnick by Edward K. Blodnick, Michael T. Rogers, Roslyn Heights, New York, for Plaintiffs.

Dwyer, Kinburn & Hall by Daniel Kinburn, Terrence Dwyer, Totowa, New Jersey, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.

In this qui tam action alleging various violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "False Claims Act" or the "Act"), defendants Kiewit/AFC Enterprises, Inc., Kiewit Eastern Co. and AFC Enterprises, Inc. (collectively, "Kiewit"), move, pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), 12(b)(6) and 56(b),[1] to dismiss the complaint (1) on the ground that Philip De-

---

1. Although Kiewit's notice of motion states that it also seeks dismissal under Rule 12(b)(6), both sides have filed supporting affidavits. Accordingly, the Court shall treat the motion as one for summary judgment. *See Grand Union Co. v. Cord Meyer Dev. Corp.*, 735 F.2d 714, 716 (2d Cir.1984).

Carlo ("DeCarlo") released Kiewit in settlement of a related civil matter; (2) for lack of subject matter jurisdiction; and (3) for failure to plead fraud or false claims with particularity. For the reasons set forth below, Kiewit's motion is granted in part and denied in part, and the complaint is dismissed without prejudice.

## BACKGROUND

On July 15, 1991, DeCarlo commenced employment as Massachusetts Electric Construction Co., Inc.'s ("Mass Electric") manager for the Hutchinson River Parkway Bridge Rehabilitation Project (the "Project"),[2] and was stationed on the project site between July 1991 and August 1992. On or about August 11, 1992, Mass Electric terminated DeCarlo's employment, and on April 23, 1993, DeCarlo commenced a civil suit in this Court for wrongful termination against Mass Electric, Kiewit and Harry Shaver, a Kiewit employee. See DeCarlo v. Massachusetts Electric Constr. Co., 93 Civ. 2690 (SWK) (the "Mass Electric" action). During the pendency of this litigation, DeCarlo wrote letters to various New York state and federal officials regarding conditions on the Project site. One such letter to the United States Department of Transportation, dated November 27, 1993, stated, in part:

> I have brought legal action against both Kiewit and Mass [Electric] as per the enclosed Summons and Complaint, and as a result of my document inspection which began on November 4, 1993 it has become clear that many other violations of various laws have occurred, with the obvious knowledge of the on site D.O.T. personnel, as well as the Construction Manager.... These include widespread violations of the prevailing wage/Davis Bacon Law, jurisdictional irregularities, inferior and unsafe work, overpayments, continued hazardous working conditions involving asbestos and

lead paint abatement, and a lack of Hazard Communications to my fellow workers.

Letter to U.S. Dep't of Trans., dated Nov. 27, 1993, annexed to the Affidavit of Terrence Dwyer, sworn to on Sept. 11, 1995 (the "Dwyer Aff."), as Exh. "H."

On May 19, 1994, DeCarlo executed a stipulation of settlement with Kiewit in the Mass Electric action, and on June 1, 1994, DeCarlo executed a general release, releasing Kiewit

> from all actions, causes of action, suits, ... controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR ... ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE.

> This Release embraces any and all matters which were or could have been asserted in the matter presently pending in the United States District Court, Southern District of New York, "entitled Philip DeCarlo, plaintiff v. Mass Electric Construction Co., Kiewit AFC/Enterprises, Inc., Kiewit Eastern Company and Harry L. Shaver, Defendants", bearing Case No. 93 CIV 2690 (SWK).

Release, dated June 1, 1994, annexed to the Dwyer Aff. as Exh. "C" (emphasis in original).

Shortly thereafter, on July 28, 1994, DeCarlo filed the present complaint against Kiewit under the qui tam provisions of the False Claims Act.[3] The complaint seeks damages and civil penalties arising from alleged false claims for payments submitted by Kiewit to the New York State Department of Transportation, the Federal Highway Administration, the United States Department of Labor, the United States Department of

---

**2.** Kiewit was awarded a contract by the New York State Department of Transportation to act as general contractor on this federally funded project. Mass Electric was the electrical subcontractor of the Project. The Project is being carried out pursuant to Federal Aid Construction Contract F.A. Project IT–213(102).

**3.** The phrase "qui tam" is shorthand for "qui tam pro domino rege quam pro se imposo sequitur," interpreted as "who sues on behalf of the King as well as for himself." Black's Law Dictionary 1251 (6th ed. 1990). Qui tam plaintiffs are frequently referred to as "relators."

Transportation and other federal and state agencies. Following the filing of this action under seal, the United States conducted an investigation into the allegations in the complaint in accordance with the requirements of the False Claims Act, *see* 31 U.S.C. § 3730(b), but ultimately declined to intervene in the suit.

Kiewit now moves to dismiss the complaint (1) on the ground that DeCarlo released Kiewit in settlement of the *Mass Electric* action; (2) for lack of subject matter jurisdiction under the False Claims Act; and (3) for failure to plead fraud or false claims with particularity.

## DISCUSSION

### I. Standard of Law

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence in support of the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. United States Fire Ins. Co.*, 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2 (Brennan, J., dissenting). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

## II. Prefiling Release of Claims

 Kiewit first moves to dismiss the complaint on the ground that DeCarlo released Kiewit from all liability pursuant to the stipulation of settlement and the release in the *Mass Electric* action. Kiewit reasons, and DeCarlo does not contest, that the present *qui tam* action falls within the scope of the release, as DeCarlo discharged all claims which were or could have been brought in the *Mass Electric* case. DeCarlo has reasserted in this action many of the same underlying allegations presented in the earlier case, and the Court finds the release sufficiently broad to encompass the present claims.

In response, however, DeCarlo urges the Court to adopt a rule rendering the prefiling release of a *qui tam* claim void as a matter of public policy where the agreement was entered into without the assent of the United States. In the alternative to finding that such a public policy exception does not exist, Kiewit asks that, in cases where a valid release is given by a relator, the Court establish a "middle ground" by barring a subsequent *qui tam* action in those cases in which the government ultimately declines to intervene.

### A. Public Policy Exception
#### 1. *Northrop*

The question whether the release of a subsequent *qui tam* action is void as a matter of public policy is one of first impression in this circuit. Recently, however, the Ninth Circuit Court of Appeals held that a *qui tam* action survives a general release for reasons of public policy. *See United States v. Northrop Corp.*, 59 F.3d 953 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996).[4] In *Northrop*, the plaintiff claimed that Northrop wrongfully discharged him upon learning that he had uncovered evidence that Northrop was overbilling the United States on a military contract. The parties ultimately negotiated a settlement with Northrop receiving a general release, settling "once and forever, all of the matters which have arisen between them...." Subsequently, however, the plaintiff filed a complaint against Northrop under the *qui tam* provisions of the False Claims Act containing the same allegations that Northrop had submitted false claims to the United States. The United States investigated the allegations in the complaint, as required by the False Claims Act, but declined to intervene in the suit.

Thereafter, Northrop moved to dismiss the *qui tam* action, arguing that the claim was barred by the settlement of plaintiff's earlier claims. As a preliminary matter, the Ninth Circuit found the enforceability of a prefiling release entered into without the United States' knowledge or consent to be governed first by the intent of Congress in enacting the False Claims Act. The court observed that, while the False Claims Act explicitly permits a plaintiff to settle a *qui tam* claim after its filing, *see* 31 U.S.C. § 3730(b)(1) (permitting settlement where "the court and the Attorney General give written consent to the dismissal and their reasons for consenting"); 31 U.S.C. § 3730(d)(2) (recognizing a relator's right to "settl[e] the claim" where the United States has chosen not to intervene), the statute is silent on the issue of pre-filing *qui tam* settlements.

The Ninth Circuit found that Congress's failure to explicitly address the enforceability of prefiling releases did not suggest that such releases were therefore enforceable. Northrop urged the court to observe the canon of statutory construction which holds that, where Congress has enacted a "comprehensive legislative scheme including an integrated system of procedures for enforcement" the courts must presume a remedy was deliberately omitted from a statute. *Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL–CIO*, 451 U.S. 77, 97, 101 S.Ct. 1571, 1583, 67 L.Ed.2d 750 (1981); *see also Karahalios v. National Fed'n of Fed. Em-*

---

4. In addition, one other court has explicitly adopted *Northrop* 's reasoning. In *United States ex rel. Pogue v. American Healthcorp, Inc.*, No. 3–94–0515, 1995 WL 626514, at *5 (M.D.Tenn. Sept. 14, 1995), *reh'g granted and order vacated on other grounds*, 914 F.Supp. 1507 (M.D.Tenn. 1996), the court relied on *Northrop* in refusing to enforce the release of a *qui tam* action as contrary to public policy.

*ployees,* 489 U.S. 527, 533, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989). The court rejected this analysis, however, reasoning that this canon of interpretation is relevant to determine whether a plaintiff has an implied cause of action, but is not used to determine whether plaintiff may relinquish a remedy that it expressly created.

Rather, the court found that Congress's failure to address this issue constituted a "gap" in the statutory scheme. The court rejected the application of state law, finding that such reliance would lead to inconsistency and frustrate the objectives of the False Claims Act. Accordingly, the court turned to federal common law to examine the scope of a relator's authority to settle a *qui tam* action after its filing.

Seeking a uniform federal common law rule, the Ninth Circuit applied the test articulated by the Supreme Court in *Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987), as developed further in *Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d 1390, 1396 (9th Cir.), *cert. denied,* 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). Under this test, "a promise [will be found] unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton v. Rumery,* 480 U.S. at 392, 107 S.Ct. at 1191; *accord Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d at 1396. The court found that *qui tam* actions under the False Claims Act serve a substantial public interest in creating incentives for individuals to supplement government enforcement by exposing private sector fraud upon the United States. The Ninth Circuit reasoned that permitting prefiling settlements would discourage a plaintiff from filing a *qui tam* action by creating perverse economic incentives. Specifically, while suc-

cessful *qui tam* relators under the False Claims Act receive a maximum of thirty percent of the total recovery, settlement before filing ensures full monetary recovery. As a result, a relator would be willing to accept a substantially smaller amount to settle a claim than to preserve the right to file a *qui tam* action in which the government would retain most of the proceeds. The Ninth Circuit determined that this scenario harms the public interest in uncovering fraud and thwarts congressional intent in protecting that interest. *United States v. Northrop Corp.,* 59 F.3d at 967 (finding "[p]reservation of the incentive effect in the prefiling period, therefore, [to be] a concern infused with the public interest").

## 2. Federal Common Law

█ The Court finds the Ninth Circuit's reasoning in *Northrop* persuasive. A threshold determination is whether in "filling in" the interstices left open in a federal statutory scheme the federal courts should fashion federal common law [5] or resort to state law. It is well-established that federal common law governs the validity of purported releases of liability in connection with federal causes of action. *Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952); *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,* 558 F.2d 1113, 1115 (2d Cir.1977). *But see Montellier v. United States,* 315 F.2d 180, 184 (2d Cir.1963) (state law applies to validity and effect of release under Federal Tort Claims Act). The very fact that federal law governs, however, does not mandate that district courts must fashion a uniform national rule. *Olin Corp. v. Consolidated Aluminum Corp.,* 807 F.Supp. 1133, 1140 (S.D.N.Y.1992). Rather, the Court must determine whether, although federal law governs, state law should be incorporated to provide the content

---

**5.** The lack of analytical precision in the term "federal common law" confronted by the Ninth Circuit in *Northrop* has been frequently noted by commentators and judges alike:

> The demarcation between "statutory interpretation" or "constitutional interpretation," on the one hand, and judge-made law on the other, is not a sharp line.... [T]he term, federal common law, [is used] to refer general-

ly to federal rules of decision whose content cannot be traced by traditional methods of interpretation to federal statutory or constitutional command.

Bator, Mishkin, Meltzer & Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 863 (1988); *see also Olin Corp. v. Consolidated Aluminum Corp.,* 807 F.Supp. 1133, 1139 n. 4 (S.D.N.Y.1992), *aff'd in part, vacated in part,* 5 F.3d 10 (2d Cir.1993).

of that federal law. *See Burks v. Lasker*, 441 U.S. 471, 477, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979); *United States v. Kimbell Foods*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). State rules of decision frequently provide an adept way to give content to, and apply, the governing federal law. *See Kimbell Foods*, 440 U.S. at 728, 99 S.Ct. at 1458.

■ The principle consideration in determining whether to incorporate state law or fashion a uniform federal standard is congressional intent. *Olin Corp. v. Consolidated Aluminum Corp.*, 807 F.Supp. 1133, 1140 (S.D.N.Y.1992). Here, however, neither the text nor the legislative history of the False Claims Act sheds light on whether a prefiling release of a *qui tam* action is enforceable or whether the False Claims Act's drafters intended federal courts to develop federal common law or incorporate state law in this area. In the absence of a clear congressional directive, the Court must decide whether formulating a uniform federal rule is appropriate under the three-part test enunciated by the Supreme Court in *United States v. Kimbell Foods*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979). *Kimbell Foods* directs the Court to assess whether (1) the issue requires "a nationally uniform body of law"; (2) "application of state law would frustrate specific objectives of the federal programs"; and (3) "application of a federal rule would disrupt commercial relationships predicated on state law." *Id.*

Here, all three factors militate in favor of a consistent federal rule. With respect to uniformity, as mentioned in *Northrop*, there is a reasonable likelihood that state law would overemphasize the interest favoring final, ironclad and enforceable general releases. *United States v. Northrop Corp.*, 59 F.3d at 961. Although individual states might reach a permissible result in such cases, there is a substantial risk that a "significant conflict" would arise "between an identifiable 'federal policy or interest and the [operation] of state law,'" *Boyle v. United Technologies Corp.*,

487 U.S. 500, 507, 108 S.Ct. 2510, 2516, 101 L.Ed.2d 442 (1988) (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (finding such a conflict to be a "precondition for recognition of a federal rule of decision"). Moreover, a uniform rule would serve to prevent parties, through use of choice of law clauses, from selecting as governing law the law of a state that is most likely to uphold a release. *Cf. Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) ("Federal statutory rights could be easily defeated if state law could be used to control the incidents of those rights and the defenses to them.").

Second, the application of state law would frustrate the purpose of the federal False Claims Act. In revising the Act in 1986, Congress expressed its concern that the "widespread fraud" directed toward the government could be successfully combatted only by "a coordinated effort of both the Government and the citizenry." S.Rep. No. 345, 99th Cong., 2d Sess. 2–3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267–68.[6] As a result, Congress sought to "increase[ ] incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government." *Id.* at 23, *quoted in* 1986 U.S.C.C.A.N. at 5288–89. Thus, a relator who properly brings a claim will receive a percentage of the recovery even if the government chooses to intervene and conduct the action itself, 31 U.S.C. § 3730(d)(I), or pursue its claim in an administrative proceeding, 31 U.S.C. § 3730(c)(5). The extent of recovery is directly tied to the importance of the relator's participation in the action and the relevance of the information brought forward. 31 U.S.C. § 3730(d)(1) (where the government chooses to conduct the action the relator receives "at least 15 percent but no more than 25 percent of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action"). This facet

---

**6.** Estimates suggest that the United States Treasury loses somewhere between $25 and $70 billion a year as a result of fraud by its contractors. *See* Erwin Chemerinsky, *Controlling Fraud Against the Government: The Need for Decentralized Enforcement*, 58 Notre Dame L.Rev. 995, 995 n. 1 (1983).

of the Act's structure evidences a congressional intent to provide a larger incentive for relators "best able to pursue claims that the government could not, and bring forward information the government could not obtain." *United States v. Northrop Corp.*, 59 F.3d at 964. In crafting provisions that specify the relator's recovery and in amending the jurisdictional provisions, Congress attempted to "walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (D.C.Cir.1994). The Court finds that enforcing a prefiling release of a *qui tam* claim would undermine this incentive structure by inducing potential relators to settle claims before alerting the government to fraudulent conduct. *See generally United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 760 (9th Cir.1993) (describing the "intertwined" nature of the relator's private interest and the public's interest in successful enforcement of the Act), *cert. denied*, 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994). Moreover, enforcing prefiling *qui tam* settlements frustrates a second, related purpose of the False Claims Act, namely the deterrence of fraud and the recovery of treasury funds lost to fraud. *See United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1346 n. 6 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d at 760.

Third, the Court holds that the application of a uniform rule will not disrupt commercial relationships predicated on state law. Such a rule would neither run the risk of arbitrary application nor would it "undercut the reliability of [a] system which plays a crucial role in commercial dealings." *See United States v. Kimbell Foods*, 440 U.S. 715, 739 n. 42, 99 S.Ct. 1448, 1464 n. 42, 59 L.Ed.2d 711 (1979). Accordingly, the Court finds that federal common law must serve as the rule of decision, and thus control the validity of the prefiling release at issue in the instant case.

### 3. Public Interest

Applying federal common law, the Court agrees with the Ninth Circuit that the *Rumery* test must be employed. In *Rumery*, the

Supreme Court held that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton v. Rumery*, 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987). In that case, the Supreme Court found enforceable an agreement by which a prosecutor agreed to waive criminal charges against the plaintiff in exchange for his agreement to waive all civil rights claims against the prosecutor. The Supreme Court found that the case involved "merely private rights" and did not implicate a "broad public interest that outweighed Rumery's voluntary decision to enter into an otherwise valid agreement." *Davies v. Grossmont Union*, 930 F.2d at 1396–97 (citing *Town of Newton v. Rumery*, 480 U.S. at 394–95, 107 S.Ct. at 1192–93).

In the present case, in contrast, serious public interests are at stake, to wit, the interest of the taxpayers and the government in recouping lost proceeds, and the public interest in the disclosure of fraudulent activity. *See Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73 (2d Cir.1982) (noting the importance of voiding agreements which tend to injure the public good or contravene some established societal interest); *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727 (S.D.N.Y.1986) (refusing to enforce a personal services contract between a Delaware corporation and a foreign government on the ground that it contravened United States public policy).

Kiewit relies on *Coleson v. Inspector Gen. of the Dep't of Defense*, 721 F.Supp. 763 (E.D.Va.1989), for the proposition that a judicial preference favoring the finality and settlement of litigation outweighs the public's interest in enforcing the False Claims Act. *Coleson* is inapposite, however, as that case was not a *qui tam* action prosecuted on behalf of the government, but involved the anti-retaliation provisions of 31 U.S.C. § 3730(h). *See Coleson v. Inspector Gen. of the Dep't of Defense*, 721 F.Supp. at 765. As such, *Coleson* does not address the governmental and public policies implicated in the instant case.

In addition, any generalized interest in settlement is heavily outweighed by the costs of "eviscerating the incentives created by the [False Claims Act]." *United States v. Northrop Corp.,* 59 F.3d at 969. Moreover, as pointed out by the Ninth Circuit in *Northrop,* the imposition of additional costs to settlement may actually further the purposes of the False Claims Act:

> Presumably, the defendants who will be deterred most from settling non-[False Claims Act] claims because of the possibility of a qui tam suit are those who face the greatest exposure under the Act. These defendants, of course, are the very defendants who are most likely to have committed fraud in the first place, and a central objective of the qui tam provisions is precisely to augment the incentives for employees of such entities to come forward. Therefore, if refusal to enforce the Release in this case increases defendants' costs, this actually might have the salutary effect of further deterring defendants from engaging in fraud, which, in the long-run, might render the costs [defendants] foresee insubstantial.

*United States v. Northrop Corp.,* 59 F.3d at 969 (citations omitted). For these reasons, the Court finds that federal common law does not recognize the effect of the parties' prior settlement on the present action.

### B. Subsequent Government Intervention

Kiewit argues, in the alternative, that public policy interests should not render void the prefiling settlement of *qui tam* actions at least where, as here, the government declines to intervene in the litigation. Kiewit theorizes that "where a valid and sufficient release is given by a *qui tam* plaintiff, the relator [should] be barred thereby from maintaining a subsequent *qui tam* action in which the government has declined to intervene." Such a policy would, for the settling relator, leave the question of whether a release is ultimately enforceable in the hands of the government.

This reasoning is flawed in several respects. First, the government's decision not to participate in the *qui tam* action is not equivalent to a consent to voluntarily dismiss a claim against a defendant with prejudice. Non-intervention does not necessarily signal governmental disinterest in an action, as it is entitled to most of the proceeds even if it opts not to intervene.

Second, a relator would be less likely to bring suit after a release if the action could be subsequently invalidated by the government's decision not to intervene. Although it ultimately declined to intervene in the present case, the government only learned of the present allegations of fraud as a result of the filing of the *qui tam* complaint. If the prevailing rule were that prefiling releases entered into without the government's knowledge or consent were enforceable, DeCarlo likely would not have filed his *qui tam* complaint, the government would not have had the opportunity to decline, and Congress's intention to deter fraudulent activity would have been effectively diluted. *See United States v. Northrop Corp.,* 59 F.3d at 966.

### III. Subject Matter Jurisdiction

■ Kiewit next argues that the Court lacks subject matter jurisdiction on the ground that DeCarlo was not an "original source" of the information within the meaning of sections 3730(e)(4)(A) and (B) of the False Claims Act. *See United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1157 (2d Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). Section 3730(e)(4) provides, in relevant part:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, ... unless ... the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4). This provision is designed to bar "parasitic lawsuits" based upon publicly disclosed information in which would-be relators "seek remuneration although they contributed nothing to the exposure of the fraud." *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d at 1157 (citing *United States ex rel. John Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir.1992)).

Kiewit argues that the information forming the basis of this action was publicly disclosed (1) through its own submission of reports to government officials; and (2) as a result of the filing of the related *Mass Electric* action. Kiewit also argues that since DeCarlo was not an "original source" of the information upon which his false claim allegations are based within the meaning of section 3730(e)(4), the Court lacks subject matter jurisdiction over the present action.

Kiewit relies primarily upon *Kreindler* for the proposition that information gleaned during the course of litigation or in discovery is "publicly disclosed" within the meaning of section 3730(e)(4). In that case, the *qui tam* relator was an attorney whose knowledge of the fraud (the allegation and its proof) originated from his exposure to discovery responses submitted while representing a client in an earlier unrelated action against the *qui tam* defendant. The Court held that discovery materials filed with the Court constituted a public disclosure of the information. Kreindler argued that because it obtained some of the information through independent investigation, and thus did not rely "solely" on the material disclosed through the prior litigation, it should not be barred from bringing suit. The Second Circuit summarily dismissed this argument:

> The phrase "solely," however, is not included in § 3730(e)(4)(A), which addresses actions "based upon" public disclosure of the underlying allegations or transactions. Further, *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d [548, 552–53 (10th Cir.1992) ], explicitly repudiates the notion that § 3730(e)(4)(A) bars only actions based "solely" upon publicly disclosed information, concluding that the statute applies to a "qui tam action ...

> based *in any part* upon publicly disclosed allegations or transactions."

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d at 1158 (quoting *United States ex rel John Doe v. John Doe Corp.*, 960 F.2d at 324) (emphasis added). Since the Court finds that there is substantial overlap between the information forming the basis of the present *qui tam* action and the information obtained during the course of the *Mass Electric* litigation, the Court finds the basis of the suit to have been publicly disclosed within the meaning of section 3730(e)(4)(A).

■ An exception to the public disclosure bar exists, however, where the relator is the "original source" of the information. 31 U.S.C. § 3730(e)(4)(B); *see also United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d at 1158–59. In order to qualify as an "original source" within the meaning of section 3730(e)(4)(B), a *qui tam* plaintiff must (1) have direct and independent knowledge of the information on which the allegations are based; (2) have voluntarily provided such information to the government prior to filing suit; and (3) have directly or indirectly been a source to the entity that publicly disclosed the allegations on which the suit is based. *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d at 1158–59; *United States ex rel. Pentagen Technologies Int'l Ltd. v. CACI Int'l Inc.*, No. 94 Civ. 2925, 1996 WL 11299, at *7 (S.D.N.Y. Jan. 4, 1996).

The direct knowledge requirement was intended to avoid parasitic lawsuits by "disinterested outsider[s]" who "simply stumble across an interesting court file." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247, 1258 (S.D.Fla.1989). Instead the Act seeks to encourage persons with "first-hand knowledge of fraudulent misconduct," *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d Cir.1991), or those "who are either close observers or otherwise involved in the fraudulent activity" to come forward. S.Rep. No. 345, 99th Cong., 2d Sess. 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5269; *see also* 132

Cong.Rec. H9389 (daily ed. Oct. 7, 1986) (Representative Berman, a co-drafter of the legislation, stated that a person is an "original source" if, inter alia, the person "had some of the information related to the claim which he made available to the government or the news media in advance of the false claims being publicly disclosed."). In particular, the Act meant to discourage persons who obtained "secondhand information from an individual who has direct knowledge of the alleged fraud [and thus] does not himself possess direct knowledge and ... is not an original source under the Act." *United States ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d 699, 703 (8th Cir.1995).

Kiewit argues that since the complaint was filed upon information and belief, DeCarlo tacitly admits that he is not the original source, lacking the requisite "direct and independent" knowledge. Kiewit contends that DeCarlo was not an original source of the information as he neither worked for Kiewit nor had any involvement in, or personal knowledge of, Kiewit's submission of documents to the government other than that gained through the *Mass Electric* action. The Court disagrees. DeCarlo had independent knowledge of Kiewit's allegedly fraudulent conduct, obtaining information and making first-hand observations during the course of his employment on the Project. *See Wang v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir. 1992) (fact of subsequent public disclosure "does not rob [plaintiff] of what he saw with his own eyes"); *United States ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d at 703 (the "direct" knowledge required under the False Claims Act is knowledge "marked by absence of an intervening agency," "unmediated by anything but [plaintiff's] own labor" and seen by plaintiff "with his own eyes" (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 656 (D.C.Cir. 1994); *Wang v. FMC Corp.,* 975 F.2d at 1417)). DeCarlo is the type of plaintiff envisioned by the *qui tam* provisions of the False Claims Act. According to the complaint, DeCarlo, as the on-site Project manager for Mass Electric, observed the field conditions and the work performed on the project on a daily basis. During his observations, DeCarlo claims to have directly witnessed Kiewit's

failures (1) to install or provide safety measures at the Project; (2) to give the New York Department of Transportation credits for unperformed work; (3) to comply with prevailing wage laws; (4) to obtain certain subcontractor approvals and to comply with Equal Employment Opportunity and other requirements; and (5) to submit accurate payment requisitions. *See* Complaint at ¶¶ 13–43, 47, 49–50, 52–55, 57–58, 60, 62 and 64. Accordingly, the Court finds that DeCarlo was an original source of the information forming the basis of his complaint, and the Court therefore has subject matter jurisdiction under section 3730(e)(4).

## IV. Failure to Plead with Particularity

Finally, Kiewit moves to dismiss the complaint on the ground that it does not comply with Federal Rule of Civil Procedure 9(b)'s requirement that fraud claims be pled with particularity. Specifically, Kiewit argues that because DeCarlo's claims are made "upon information and belief" and lack the specificity required under Rule 9(b), the complaint should be dismissed.

Federal Rule of Civil Procedure 9(b) provides, in relevant part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Rule 9(b) applies to all allegations of fraud, including actions brought pursuant to the False Claims Act. *Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475, 1476 (2d Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 1836, 134 L.Ed.2d 939 (1996); *United States ex rel. Robinson v. Northrop,* 149 F.R.D. 142, 145 (N.D.Ill.1993). A complaint alleging fraud must " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)); *see also Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). Rule 9(b)'s heightened pleading requirements reflect "the desire to spare defendants the harm to their reputations attendant to an allegation of fraud absent con-

crete factual circumstances supporting the allegation." *Devaney v. Chester,* 709 F.Supp. 1255, 1260 (S.D.N.Y.1989); *see also IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993), *cert. denied,* — U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994) (requirement ensures defendant receives fair notice while protecting the defendant's reputation and discouraging strike suits).

■ In general, Rule 9(b) pleadings cannot be based upon information and belief. *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972). An exception exists, however, where pertinent information is particularly within the defendant's knowledge. *Devaney v. Chester,* 709 F.Supp. at 1260. In such cases, some elements of fraud may be justifiably pled on information and belief, although the complaint must still present facts upon which such belief is reasonably founded. *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). At any rate, the degree of particularity required should be determined "in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987); *accord Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (greater precision required "when full discovery has been had in a prior case").

Here, DeCarlo has conducted extensive and wide-ranging discovery in the related *Mass Electric* case. Both actions arose out of alleged events that transpired during the performance of Kiewit's contract with the New York State Department of Transporta-

tion to act as general contractor on the Project. Principals of Kiewit and Mass Electric and New York State Department of Transportation officials were deposed, and DeCarlo reviewed thousands of Kiewit and Mass Electric Project documents.

The complaint's allegations of fraud in light of the prior discovery compels the Court to conclude that the fraud allegations are deficient under Rule 9(b) in several respects. First, the complaint contains twenty-five fraud-based allegations made on information and belief,[7] pertaining to all of the categories of false claims alleged to have been made by Kiewit.[8] Yet, despite a substantial period of discovery, none of DeCarlo's operative False Claims Act averments are made on direct knowledge.

Second, the complaint fails to refer to specific employees who may have been involved in submitting false claims. In *United States ex rel. Robinson v. Northrop,* 149 F.R.D. 142, 145 (N.D.Ill.1993), the complaint alleged that the defendant, Northrop once again, made fraudulent statements to the government through certain employees identified variously as "a Northrop engineer," "Northrop employees," or "supervisors." *Id.* at 145. The Court found these identifications to be insufficient under Rule 9(b), stating that it was "not enough for plaintiffs to allege that 'a Northrop engineer' or 'Northrop employees' or 'supervisors' committed fraudulent acts," and that "the identity and/or role of the individual employee involved in the alleged fraud must be specified in the complaint." *Id.* at 145. Here, the complaint refers only to "Kiewit" without identifying the individuals involved in the alleged fraud to any extent. Third, the complaint lacks specificity in describing fraud related to payroll issues,[9]

---

7. *See* Complaint at ¶¶ 18, 20, 21, 23, 25, 26, 28, 29, 31, 32, 34, 35, 38, 40, 41, 43, 46, 49, 50, 52, 55, 58, 60, 62 and 64.

8. *See* Complaint at ¶¶ 49, 50, 52, 55, 58, 60, 62 and 64.

9. For example, paragraph 50 states: "Upon information and belief, each and every weekly payroll report was false for at least one of the following reasons." Complaint at ¶ 50. The complaint then lists three categorical areas which purportedly apply to each and every of the 180 weekly payroll reports, including: (1) the

reports did not contain the names and wages paid to Kiewit's administrative personnel who were openly performing undescribed direct labor on the Project; (2) the reports certified that the workers listed were paid by Kiewit, when in fact they were paid by "other undocumented employers and disallowed second tier subcontractors"; (3) the reports certified that unidentified workers were paid prevailing wages, when the workers in fact had performed work in other classifications requiring a higher wage rate. *Id.* Such generalizations could not possibly apprise Kiewit of which Kiewit employees were allegedly performing what direct labor, which workers were being

as well as the respective dates of various instances of fraud. For these reasons, the Court finds that DeCarlo has failed to satisfy Rule 9(b). The Court therefore dismisses the complaint without prejudice, and grants DeCarlo leave to amend the complaint in order to bring it into compliance with Rule 9(b). DeCarlo may submit an amended complaint within thirty days from the date of entry of this Memorandum Opinion and Order.

## CONCLUSION

For the reasons outlined above, Kiewit's motion to dismiss the complaint based on (1) the parties' prior settlement; and (2) lack of subject matter jurisdiction under 31 U.S.C. § 3730(e)(4), is denied. Kiewit's motion, pursuant to Federal Rule of Civil Procedure 9(b), to dismiss the complaint for failure to plead fraud with particularity is granted and the complaint is dismissed without prejudice. An amended complaint may be submitted within thirty days from the date of this Memorandum Opinion and Order.

SO ORDERED.

paid by which undocumented subcontractors, or which workers were performing work in classifi-

cations that required a higher wage rate.