NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

-----------------------------------------------x

| | |
|---|---|
| NICHOLAS L. DEPACE, M.D., : | TAX COURT OF NEW JERSEY |
| : | DOCKET NO: 013396-2019 |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| DIRECTOR, DIVISION OF : | |
| TAXATION, : | |
| : | |
| Defendant. : | |

-----------------------------------------------x

Decided: December 21, 2020

Jack A. Myerson and Matthew L. Miller for plaintiff (Myerson & O'Neill, attorneys).

Ramanjit K. Chawla for defendant (Gurbir S. Grewal, Attorney General of New Jersey, attorney).

CIMINO, J.T.C.

Plaintiff, Nicholas DePace, M.D. (Taxpayer), received an award under both the federal and state False Claims Acts after reporting the practice of a hospital paying doctors for patient referrals. The parties agree the Taxpayer pays New Jersey gross income tax on his portion of the award. The parties disagree as to who pays tax on the portion of the award payable to his attorney. The Director asserts that in accordance with Kite v. Dir., Div. of Tax'n, 453 N.J. Super. 146 (App. Div. 2018),

both the Taxpayer and his attorney pay gross income tax on the attorney's fee award. The Taxpayer asserts only the attorney pays tax on the attorney's fee portion of the award and the Director's position constitutes double taxation. Based upon the prior holding of the Appellate Division in <u>Kite</u>, as well as the legislative activity subsequent to <u>Kite</u>, the court denies the Taxpayer's motion and grants the Director's motion.

I.

Taxpayer, Dr. Nicholas DePace, is a medical doctor who initiated a <u>qui tam</u> action against the Cooper Health System (Cooper) as well as related entities. <u>See</u> <u>United States ex. rel. DePace v. Cooper Health Sys.</u>, 940 F. Supp.2d 208, 209 (D.N.J. 2013). "The phrase 'qui tam' is shorthand for 'qui tam pro domino rege quam pro se imposo sequitur,' interpreted as 'who sues on behalf of the King as well as for himself.'" <u>United States ex. rel. DeCarlo v. Kiewit/AFC Enter.</u>, 937 F. Supp. 1039, 1041 n.3 (S.D.N.Y. 1996) (citing <u>Black's Law Dictionary</u> 1251 (6th ed. 1990)). The statutory provisions governing <u>qui tam</u> actions are the federal False Claims Act, 31 U.S.C. § 3729 to § 3733, and the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 to -17.

Dr. DePace alleged that Cooper had paid physicians improper referral fees to induce them to refer patients to Cooper for cardiac services. <u>DePace</u>, 940 F. Supp.2d

2

at 209.  Since these cardiac services were billed to Medicare and Medicaid, Dr. DePace alleged the referral fees were barred under various federal and state anti-kickback laws, giving rise to the False Claims Acts claims.  Ibid.

Both the federal and state False Claims Acts provide that the relator, Dr. DePace in this case, is to receive a percentage of the amount recovered by the federal and state governments.  31 U.S.C. § 3730(d).  N.J.S.A. 2A:32C-7.  Qui tam plaintiffs are frequently referred to as relators since they are not the actual party in interest, the actual party in interest being either the federal or state governments.  See DeCarlo, 937 F. Supp. at 1041 n.3.

Qui tam actions are filed under a seal, and the government is given the chance to intervene.  In this case, the United States and the State of New Jersey decided to intervene, and on January 22, 2013 the matter was settled.  DePace, 940 F. Supp.2d at 210.  Under the settlement agreement, Cooper agreed to pay the United States $10,269,000 plus interest and the State of New Jersey $2,331,000 plus interest.[1]  Ibid.  Out of the money received from Cooper, the United States agreed to pay Dr. DePace $1,951,110 and New Jersey agreed to pay Dr. DePace $442,890.  Ibid.  In

---

[1]  Both laws provide the government can recover three times the amount of the claim.  31 U.S.C. § 3729(a)(1).  N.J.S.A. 2A:32C-3.

addition, Cooper agreed to pay Dr. Depace's $430,000 towards attorney's fees.[2] [3]

Ibid.

Dr. Depace had a written fee agreement that provided his counsel was to receive a contingent fee on top of any fees awarded by the court. Ibid. A dispute arose over the amount of the contingent fee. Id. at 211. The issue came before the United States District Court for the District of New Jersey, which handled the underlying qui tam action. The District Court ruled that counsel was entitled to the contingent fee set by the agreement. Id. at 217. A few more rounds of litigation ensued before the District Court, the United States Court of Appeals for the Third Circuit and the Pennsylvania Court of Common Pleas. See United States ex. rel. DePace v. Cooper Health Sys. (DePace II), 958 F. Supp.2d 564, 566-67 (D.N.J. 2013). Eventually, the dispute settled with the attorneys receiving a fee of $920,918 (in addition to the fee of $430,000). Of that amount, Dr. DePace sought to exclude

---

[2] The law also provides that the offending party can also be required to make a contribution towards the attorney's fees of the relator. 31 U.S.C. § 3730(d). N.J.S.A. 2A:32C-8.

[3] The taxability of the fee paid directly by Cooper to Dr. DePace's counsel is not before the court.

from his 2013 New Jersey income $750,548 representing the portion of the award attributed to the federal recovery.[4]

An audit ensued in which the Director determined that the $750,548 was taxable and a deficiency assessment was issued in 2017 for additional tax. Dr. DePace paid the tax assessment and sought an administrative conference with a Director's representative who upheld the audit in 2019. He then filed a complaint with this court seeking a refund.

Dr. DePace has moved for summary judgment and the Director has cross-moved for summary judgment. Summary judgment may be granted only where a review of the evidence presented demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 536 (1995).

---

[4] It was not explained why Dr. DePace only sought to exclude the federal portion of the contingent fee award. However, at that time, only the federal portion could be deducted above-the-line for federal income tax purposes per the Civil Rights Tax Relief Act of 2004, Pub. L. No. 108-357, 118 Stat. 156 (codified as I.R.C. § 62(a)(20), (e)). The Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 Stat. 158 (codified at § 62(a)(21)(i)(II)) extended the above-the-line deduction to state qui tam actions. Prior to the aforementioned act of Congress, while the fees may have been deductible under Schedule A, the Alternative Minimum Tax effectively phases out many of the deductions for higher income taxpayers. I.R.C. §§ 55, 56, 67. With limited exceptions, the types of deductions allowed under federal Schedule A are not available under the New Jersey Gross Income Tax. The tax consequences of an above-the-line deduction are identical to an exclusion from income.

Since the material facts of this case are not in dispute, the matter is ripe for summary judgment.

II.

The controlling decision in this matter is <u>Kite</u>. <u>Id.</u>, 453 N.J. Super. 146. Kite had filed an action pursuant to the federal False Claims Act and obtained an award. <u>Id.</u> at 149. Kite primarily argued that the entire award was not taxable based upon a number of theories. <u>Id.</u> at 152-55 (point heading III). The Appellate Division rejected these theories. As a fallback position, Kite argued that if the award was fully taxable to him, the attorney's fee was deductible. <u>Id.</u> at 151, 155-56 (point heading IV). Unlike the federal income tax (a net income tax), under the New Jersey Gross Income Tax Act, deductions are limited. The Appellate Division determined that Kite could not deduct the attorney's fee portion of the award in calculating his gross income tax assessment. <u>Ibid.</u>

While <u>Kite</u> was pending in the courts, the Legislature was considering whether to amend the Gross Income Tax Act so that gross income would not include attorney's fees received in unlawful discrimination and retaliation matters. <u>S. 2943</u>/<u>A. 4770</u> (2015); <u>S. 789</u> (2016); <u>S. 784</u>/<u>A. 3614</u> (2018). The issue of deductibility would then become moot since the attorney's fees would not be income in the first place. With the Appellate Division reaching a decision in <u>Kite</u>, a senate

6

floor amendment was adopted which expanded the bill to include qui tam actions.[5] Statement to S. 784 with Senate Floor Amendments (Feb. 26, 2018). See also S. 784 (1st Reprint) (Dec. 18, 2018) (containing floor amendment text).

The proposal to amend the Gross Income Tax Act to exclude attorney's fees and costs was first introduced in 2015. See S. 2943/A. 4770 (2015). The legislation was drafted and supported by the New Jersey State Bar Association. Capitol Report; The Bar Report Weekly News from the New Jersey State Bar Association, N.J.L.J. vol. 221, no. 24, p. 28 (Dec. 14, 2015). The bill was designed to achieve the same relief afforded by the federal Civil Rights Tax Relief Act of 2004, Pub. L. No. 108-357, 118 Stat. 1546 (codified at I.R.C. § 62(a)(20), (e)). Sponsor's Statement to S. 2943 2-3 (May 18, 2015); S. Budget & Appropriations Comm. Statement to S. 784 (1st Reprint) 1 (Feb. 15, 2018); A. Judiciary Comm. Statement to S. 784 (1st Reprint) 1 (Sep. 17, 2018). That federal act allowed successful litigants to deduct attorney's fees from the award in calculating taxable income for federal income tax purposes. While the federal act did not exclude attorney's fees from income as proposed by the New Jersey Legislature, the end result was the same in that only the attorney would pay income tax on the attorney's fee portion of the award.

---

[5] At the close of the Kite opinion, the Appellate Division suggested that the public policy concerns of taxing qui tam awards should be addressed by the political branches of government. Id., 453 N.J. Super. at 156.

The federal act was proceeded by almost fifty years of litigation in various federal courts over whether attorney's fees, which were part of a contingent fee award, were income to a successful litigant. See Cotnam v. Comm'r, 263 F.2d 119, 125 (5th Cir. 1959). The United States Circuit Courts of Appeal were split on this issue. The Second, Third, Fourth, Seventh, Tenth and Federal Circuits ruled that attorney's fees were indeed taxable to the client as income. Raymond v. United States, 355 F.3d 107, 117-18 (2d Cir. 2004); Hukkanen-Campbell v. Comm'r, 274 F.3d 1312, 1314 (10th Cir. 2001); Kenseth v. Comm'r, 259 F.3d 881, 884-85 (7th Cir. 2001); Young v. Comm'r, 240 F.3d 369, 379 (4th Cir. 2001); Baylin v. United States, 43 F.3d 1451, 1455 (Fed. Cir. 1995); O'Brien v. Comm'r, 319 F.2d 532 (3d Cir. 1963). On the other hand, the Fifth, Sixth, Ninth and Eleventh Circuits held that fees were not. Banks v. Comm'r, 345 F.3d 373, 386 (6th Cir. 2003), rev'd, Comm'r v. Banks, 543 U.S. 426 (2005); Srivastava v. Comm'r, 220 F.3d 353, 357-65 (5th Cir. 2000); Barlow-Davis v. Comm'r, 210 F.3d 1346, 1347-48 (11th Cir. 2000); Banaitis v. Comm'r, 340 F.3d 1074, 1081-83 (9th Cir. 2003), rev'd, Comm'r v. Banks, 543 U.S. 426 (2005). Even the United States Tax Court, sitting en banc, was split over the issue. Kenseth v. Comm'r, 114 T.C. 399 (2000). There have been numerous academic commentaries on the subject. See, e.g., Brant J. Hellwig, The Supreme Court's Casual Use of the Assignment of Income Doctrine, 2006 U. Ill. L. Rev. 751 (2006) (citing numerous academic sources).

As to including attorney's fees as income for federal taxation, the issue finally reached the Supreme Court in 2005, a year after Congress acted to allow the above-the-line deduction. Comm'r v. Banks, 543 U.S. 426 (2005). There were still cases in the pipeline from before the enactment. The Supreme Court in a narrowly drafted opinion ruled that attorney's fees were indeed income to the client. Id. at 438-39. However, the Court made clear it was not deciding the issue in the case of qui tam actions or court ordered attorney's fees. Ibid.

The plethora of federal decisions and academic commentary may have been helpful in determining whether attorney's fees are indeed income; an issue which had not been resolved by the Appellate Division since the taxpayer in Kite essentially conceded the fees were income and instead argued that the fees were deductible. Kite, 453 N.J. Super. 151, 155-56 (point heading IV). Even so, the legislative history of the New Jersey effort to exclude the fees from income militates against finding the fees are not income to the taxpayer.

As indicated, when the bill S. 784 was first introduced it only sought exclusion of the attorney's fees portion of the award in discrimination and whistleblower actions. Shortly after the Appellate Division handed down its decision in Kite, a senate floor amendment was adopted to include qui tam actions as part of the bill's income exclusions. Statement to S. 784 with Senate Floor Amendments (Feb. 26,

2018).  See also S. 784 (1st Reprint) (Dec.  18, 2018) (containing floor amendment text).

Eventually, the bill passed both houses of the Legislature without any opposition.  2018 Voting Record NJ S.B. 784 (Lexis) (Dec. 17, 2018); 2018 Voting Record NJ S.B. 784 (Lexis) (Apr. 12, 2018).  On January 31, 2019, the Governor issued an absolute veto of the bill.  Governor's Veto Statement to S. 784 (1st Reprint) (Jan. 31, 2019).  Subsequent to the veto, no further action was taken by the Legislature.

In vetoing the bill, the Governor indicated he "endorse[s] the policy goals that this bill seeks to achieve. . ."  Id. at 1.  He does not explicitly indicate what these policy goals are.  However, later in the veto message the Governor indicates he "remain[s] committed to [] building a stronger and fairer New Jersey.  Incentivizing whistleblowers and the victims of workplace discrimination and retaliation to confront injustices is certainly part of that commitment."  Id. at 2.

On the other hand, the Governor noted the legislation was "likely to result in a tax revenue loss to the State of approximately $245 million over the next four years, including a loss of approximately $56 million for the current Fiscal Year."  Ibid.  The Governor noted that under the State Constitution, gross income tax revenue go towards "'offsetting property taxes,' which is a major source of funding

10

for New Jersey's public schools. Any significant, new exclusions allowed against the income tax would directly lead to a reduction of available State aid for public schools and other property tax relief programs relied upon by the State's local governments and their residents." Ibid. (citation omitted). Thus, the Governor weighed the competing policy interests at stake, and came down on the side of vetoing the legislation to maintain tax revenues that would ultimately help fund public schools.

When the Gross Income Tax Act was adopted in 1976, there was not any language of how attorney's fees would be taxed. The policy goals of confronting certain injustices may have generally been on the minds of the Legislature and Governor during this time period. See L. 1975, c. 35 (amending New Jersey Law Against Discrimination to prohibit discriminatory lending practices). L. 1977, c. 96 (amending New Jersey Law Against Discrimination to prohibit discrimination on the basis of nationality). Practically speaking though, it is not likely the taxability of attorney's fees issue was contemplated.

However, the countervailing public policy arguments regarding taxation and school funding which the Governor elucidated in 2019 were certainly on the mind of the legislature in 1976. In 1973, the Supreme Court had determined that the State was not providing a "thorough and efficient education" as mandated by the State Constitution. Robinson v. Cahill (Robinson I), 62 N.J. 473, 515-20 (1973). This

11

was especially true when it came to the funding of urban schools.  Id. at 519.  The Court ruled that the Legislature must act by December 31, 1974 to fix the problem effective July 1, 1975.  Robinson v. Cahill (Robinson II), 63 N.J. 196, 198 (1973). The legislature could not form a consensus to act and the matter returned to the Court which ordered a provisional spending plan.  Robinson v. Cahill (Robinson IV), 69 N.J. 133, 148 (1975).

On September 29, 1975, the Public School Education Act of 1975 was enacted.    L. 1975, c. 212.   There was not a sufficient funding mechanism to implement the act.  The Court then ordered that if a sufficient funding mechanism for the 1976-77 school year was not in place by April 6, 1976, the Court would entertain an order to show cause to shut down the educational system in the state on June 30, 1976.   Robinson v. Cahill (Robinson V), 69 N.J. 449, 468 (1976).  The funding mechanism chosen by the Legislature was a gross income tax which was passed by the Assembly on March 15, 1976.  Minutes of the Votes & Proceedings of the 1st Ann. Sess. of the One Hundred Ninety Seventh Gen A. 226 (adopting A. 1513).  The Senate did not pass a bill.  Journ. of the 1st Ann. Sess. of the One Hundred and Twenty-Ninth S. 285 (only a second reading of A. 1513).

On May 13, 1976, the Court ordered the educational system to shut down July 1, 1976 unless legislation was enacted.  Robinson v. Cahill (Robinson VI), 70 N.J. 155, 160-61 (1976).   July 1, 1976 came and went without enactment and the

injunction went into effect. Finally, on July 8, 1976, a bill was passed and in the Governor's signing statement he requested that the Court dissolve the injunction. Governor's Message on Signing A.1513 (July 8, 1976). The Court dissolved the injunction the same day. Robinson v. Cahill (Robinson VIII), 70 N.J. 465 (1976).

The bill passed by both houses and signed into law by the Governor on July 8, 1976 was the Gross Income Tax Act. L. 1976, c. 47, N.J.S.A. 54A:1-1 to 9-27. The essential provisions governing the taxation of awards has remained the same since the Act passed. N.J.S.A. 54A:5-1. The Act not only funded the public schools, but also provided local property tax relief through such funding. N.J.S.A. 54A:9-25. Forty-three years later in 2019, the Governor relied upon the need to fund public schools and property tax relief as to the basis for vetoing the attorney's fees taxation bill. All in all, this lengthy and tortured legislative history of the Gross Income Tax Act indisputably indicates that property taxes and the funding of public schools were at the forefront of the concerns to be addressed.

"A court's preference between . . . two approaches to the problem . . . is irrelevant here, for our task, as always, is to seek the legislative intent." State v. Des Marets, 92 N.J. 62, 72 (1983). "In construing a statute in accordance with the underlying intention of the Legislature, [the court] may properly take into account significant developments in legislative and public policy subsequent to the time of the original enactment." Uricoli v. Bd. of Trustees, 91 N.J. 62, 77 (1982).

13

This court "recognize[s] [the] obvious danger in placing too much weight on the significance of unsuccessful attempts to modify a statute as a means of understanding an existing statute. . ." Evans v. Atlantic City Bd. of Educ., 404 N.J. Super. 87, 95 (App. Div. 2008). While caution is necessary, it does not foreclose the use of such history. In In re Adoption of a Child by W.P., 163 N.J. 158 (2000), a proposed amendment was removed by the Senate Judiciary Committee. Id. at 172. Our Supreme Court considered such rejection of the proposed amendment as part of the legislative history contributing to an understanding that the remedy sought by the proposal was not part of the legislative scheme. Id. at 171-73.

In Evans, the Appellate Division considered the Legislature's resistance to expanding a scope of a statute beyond what the Appellate Division termed the statute's "clear" contours. Id., 404 N.J. Super. at 95. While the contours of the statute on its face in this case may not be "clear," the fact remains that the Governor resisted an effort to change the legislation.

Constitutionally, the Governor has a role in the legislative process. Upon a bill passing both houses, the Governor can sign the bill into law, do nothing and in most cases the bill becomes law forty-five days later, issue a conditional veto suggesting language that would make the bill acceptable to him or issue an absolute

14

veto. [6,7]  N.J. Const. art. V, § 1, ¶ 14.  Here, the Governor chose an absolute veto. With an absolute veto, each house can override the veto with a two-thirds vote.  Ibid. Despite the bill passing both houses without opposition, no attempt was made to override the veto.

The Governor's veto message is part of the legislative process.  See Evans, 404 N.J. Super. at 94.  In his veto statement, the Governor made clear why he was vetoing the bill.  He weighed the importance of incentivizing whistleblowers and victims of workplace discrimination and retaliation to confront injustices versus decreased revenues which would impact offsetting property taxes and funding for the schools.  He chose offsetting property taxes and funding for the schools.  If this court were to somehow decree a different interpretation of the statute (i.e., by excluding the attorney's fees from a plaintiff's income), this court would be effectively overriding the Governor's veto.

We have the people and the three branches of government.  It is the role of the people and the political branches (executive and legislative) to set policy.  The people set policy through the Constitution.  The political branches set policy through

---

[6]  Special rules and timelines apply if the legislature is in adjournment sine die or near the expiration of the second legislative year of a term. N.J. Const. art. V, § 1, ¶ 14(c).

[7]  For appropriation bills, the Governor also has the line item veto. N.J. Const. art. V, § 1, ¶ 15.

15

legislation. The court's role is to discern the policy set by the people and the political branches. While a court in the judicial branch may be empowered to overcome the will of the governor or the legislature in the event it conflicts with the will of the people as enumerated in our Constitution (i.e., Robinson v. Cahill, 62 N.J. at 515-19), this court cannot reweigh competing policy considerations of the political branches which are part of the legislative process.

On a more practical note, this court declines "to jump into the treacherous crosscurrents of state-house policymaking. . ." Cargill Meat Solutions Corp. v. Director, Div. of Tax'n, 31 N.J. Tax 506, 522 (2020). In his veto message, the Governor indicated he wants to "work[] collaboratively with legislative leadership on the budget . . . to ensure that the State's overall tax policy is established and maintained in a coordinated manner so that we can continue to meet our obligations to the State of New Jersey and its residents now and in the future." Governor's Veto Statement to S. 784 (1st Reprint) 2-3 (Jan. 31, 2019). The give and take of such budgetary and tax policy negotiations between the two political branches is something the court does not want to intrude upon. The Governor made clear his reasons for not accepting the amendments to the Gross Income Tax Act. To now read the statute differently to obtain a contrary result would be judicial encroachment upon the legislative process.

16

III.

For the forgoing reasons, the Director's motion for summary judgment is granted and the Taxpayer's motion for summary judgment is denied.